Karen R. Baker, Justice, concurring.
I agree with the majority's disposition; however, I write separately for the reasons stated in my dissents in Board of Trustees of University of Arkansas v. Andrews , 2018 Ark. 12, 535 S.W.3d 616 and Arkansas Oil & Gas Comm'n v. Hurd , 2018 Ark. 397, 564 S.W.3d 248. While I concur, I must note the majority's footnote- Andrews has no bearing on a citizen's right to bring an illegal-exaction claim-is not supported by Andrews and its progeny. The majority's footnote states:
We further note that the decision in Board of Trustees of University of Arkansas v. Andrews , 2018 Ark. 12, 535 S.W.3d 616, has no bearing whatsoever on the right to sue provided to citizens in article 16, § 13, as Andrews dealt solely with the issue of whether the legislature was permitted to waive the state's constitutional immunity through statute.
Despite the majority's footnote, this simply conflicts with the broad language employed by Andrews . Article 5, section 20 of the Arkansas Constitution provides that "[t]he State of Arkansas shall never be made defendant in any of her courts." As explained by the majority in Andrews , "We interpret the constitutional provision, 'The State of Arkansas shall never be made a defendant in any of her courts,' precisely as it reads." 2018 Ark. 12, at 10, 535 S.W.3d at 622. Further, sovereign immunity is jurisdictional immunity from suit, and jurisdiction must be determined entirely from the pleadings. Andrews , supra (citing LandsnPulaski, LLC v. Ark. Dep't of Corr. , 372 Ark. 40, 269 S.W.3d 793 (2007) ; Clowers v. Lassiter , 363 Ark. 241, 213 S.W.3d 6 (2005) ; Ark. Tech Univ. v. Link , 341 Ark. 495, 17 S.W.3d 809 (2000) ). In the present case, the majority holds that the appellants' complaint does not sufficiently establish an illegal-exaction case pursuant to 12(b)(6) of the Arkansas Rules of Civil Procedure. However, based on Andrews , because the State may never be sued-there is jurisdictional immunity from suit-the appellants' pleadings are inconsequential. Accordingly, because we interpret the constitution "precisely as it reads," the appellees, as agencies of the State, are immune from suit. Of course, this is an absurd result, but as I noted in my dissent in Andrews , the manner in which the majority interpreted article 5, section 20 conflicted with various other constitutional provisions. Id. at 15-16, 535 S.W.3d at 624-25 (Baker, J., dissenting). Further, I specifically included "illegal-exaction cases" in my bulleted listed as one of the "specific types of actions that the majority's decision calls into question when the suit is filed against the State of Arkansas." Id. at 18, 535 S.W.3d at 626-27 (Baker, J., dissenting). Andrews did not identify exceptions, exemptions, or the like. Again, the State may never be sued. Hurd , 2018 Ark. 397, at 18, 564 S.W.3d at 258 (Baker, J., dissenting). Accordingly, I must concur.
Josephine Linker Hart, Justice, dissenting.
I dissent. When the government is engaged in wasteful and fiscally irresponsible *6 activity, an illegal-exaction lawsuit brought by a taxpayer is often the only thing that can stop it. Here, a group of taxpayers asserts that the Arkansas Department of Transportation (ARDOT) is about to destroy one of our state's historic structures, the old U.S. 79 White River Bridge at Clarendon, Arkansas (the Clarendon Bridge), at a cost of no less than $ 10.8 million. According to the complaint, ARDOT insists on this course of action, even though the bridge's destruction (1) is unnecessary and will not serve its intended purpose; (2) is expressly illegal for lack of federally required workability assessments, which would show that the destruction of the bridge is unnecessary and will not serve its intended purpose; and (3) will eliminate a substantial and ready-to-implement economic-development plan featuring the Clarendon Bridge that would bring tourism revenue to a region of our state that could use it. The complaint sufficiently states an illegal exaction claim.[1]
This court reviews a circuit court's decision to grant a motion to dismiss under the abuse-of-discretion standard. Born v. Hosto & Buchan, PLLC , 2010 Ark. 292, at 4, 372 S.W.3d 324, 329. In making its determination, this court treats the facts alleged in the complaint as true and views them in the light most favorable to the plaintiff. J.B. Hunt, LLC v. Thornton , 2014 Ark. 62, at 5, 432 S.W.3d 8, 11.
The Arkansas Constitution permits any citizen to sue to protect "against the enforcement of any illegal exactions whatever." Ark. Const. art. XVI, § 13. Arkansas law has consistently acknowledged that taxpayers are the equitable owners of public funds and that their liability to replenish the funds exhausted by misapplication entitles them to illegal-exaction relief against such misapplication. Farrell v. Oliver , 146 Ark. 599, 602, 226 S.W. 529, 530 (1921) ; Ward v. Farrell , 221 Ark. 363, 367, 253 S.W.2d 353, 356 (1952). The purpose of illegal exaction is to "prevent a mis-application of funds." Mackey v. McDonald , 255 Ark. 978, 982, 504 S.W.2d 726, 731 (1974). Illegal exaction has been specifically applied to federal funds, and "it is clear, that once these funds reach the 'treasury' they are protected by the illegal exaction safeguards." Id. at 736. " 'Illegal Exaction' under the Arkansas Constitution means both direct and indirect illegal exactions, thus comprehending any attempted invalid spending or expenditure by any government official.... With little limitation, almost any misuse or mishandling of public funds may be challenged by a taxpayer action.... The remotest effect upon the taxpayer concerning any unlawful act by a tax supported program or institution may be enjoined under Article XVI." Nelson v. Berry Petroleum Co. , 242 Ark. 273, 277, 413 S.W.2d 46, 49 (1967) (emphasis added).
Federal authority requires that any authorized use of a National Wildlife Refuge System area, such as that contemplated by the 2009 Exchange Deed at issue here, must be predicated upon a valid "compatibility determination." 50 C.F.R. § 26.41. The requirements of a given compatibility determination are substantial and varied.[2] Id. Absent exceptions not applicable *7 in this case, no use will be permitted or re-authorized for a period longer than ten years unless there is a new compatibility determination. 50 C.F.R. § 25.21(h). Moreover, if the conditions under which a use was permitted change significantly, or if there is significant new information regarding the effects of the use, there must be a new compatibility determination, then and there. 50 C.F.R. § 25.21(g). The re-evaluation must be assessed based on the "existing conditions with the use in place, not from the pre-use perspective." 50 C.F.R. § 25.21(h). This requires "a fresh look at the use" and, importantly, "[preparing] a new compatibility determination." 50 C.F.R. § 25.21(i).
The taxpayers' complaint sets forth a number of allegations relevant to our consideration of this issue. First, the Exchange Deed was predicated upon a compatibility determination prepared in 2005, well over ten years prior to the filing of the taxpayers' complaint. The 2005 compatibility determination included a finding that destruction of the Clarendon Bridge was necessary for the project's implementation, so to prevent adverse-floodplain consequences. This finding was based on the results of a hydrological report prepared in connection to the 2005 compatibility determination, which simulated five- and hundred-year flood-flow events along the White River. Importantly, in simulating the flood flow events, the old hydrological report assessed the Clarendon Bridge together with a separate roadway that extended 9,000 feet west of the bridge on a fifteen-foot-high berm, which had acted as a dam impeding flood flows in the refuge. There has been no new compatibility determination performed since the 2005 compatibility determination, even though the berm has since been removed.
The entire point of the taxpayers' illegal-exaction claim is that the circumstances have significantly changed since this plan was set in motion. The 2005 compatibility determination has expired. Moreover, the berm has since been removed. The old hydrological report did not model, evaluate, analyze, or otherwise even mention the Clarendon Bridge as it exists today after the berm removal, and it does not suggest that the Clarendon Bridge itself is causing any tangible impact on flood flows along or across the White River *8 floodplain. In other words, according to the taxpayers, we are about to spend $ 10.8 million to blow up a piece of our state's history that does not need to be blown up, and if the powers that be would simply replace their expired compatibility determination with a new one as legally required , they would be forced to acknowledge as much.
What makes this alleged wasteful spending even more frustrating to the taxpayers is the opportunity cost. The City of Clarendon has formally adopted a detailed economic-development plan for the surrounding region, the centerpiece of which is the historic Clarendon Bridge. This plan would see the creation of one of the longest elevated bicycling, pedestrian, and nature-watching platforms in the entire world, right here in the Arkansas Delta. It is also proposed that the Department of Arkansas Heritage and the Arkansas Department of Parks and Tourism will pay for the bridge's maintenance. Truly, there appears to be a legitimate and substantial opportunity here that will be lost when the bridge is destroyed.
ARDOT's refusal to follow the law and obtain a new compatibility determination as required does not make any sense. Likewise, the majority fails to acknowledge this legal requirement or address its impact on the issue presented. The majority opinion amounts to a premature detonation.
I dissent.

I do commend Justice Wynne for clearly reiterating that sovereign immunity is not a viable defense against an illegal-exaction claim. That an agency of our state would even put forth a proposition to the contrary is, to put it lightly, scary.

Every compatibility determination must include, at least, the following information:
(1) The proposed or existing use;
(2) The name of the national wildlife refuge;
(3) The authorities used to establish the national wildlife refuge;
(4) The purpose(s) of the national wildlife refuge;
(5) The National Wildlife Refuge System mission;
(6) The nature and extent of the use including the following:
(i) What is the use? Is the use a priority public use?;
(ii) Where would the use be conducted?;
(iii) When would the use be conducted?;
(iv) How would the use be conducted?; and
(v) Why is the use being proposed?.
(7) An analysis of costs for administering and managing each use;
(8) The anticipated impacts of the use on the national wildlife refuge's purposes and the National Wildlife Refuge System mission;
(9) The amount of opportunity for public review and comment provided;
(10) Whether the use is compatible or not compatible (does it or will it materially interfere with or detract from the fulfillment of the National Wildlife Refuge System mission or the purpose(s) of the national wildlife refuge);
(11) Stipulations necessary to ensure compatibility;
(12) A logical explanation describing how the proposed use would, or would not, materially interfere with or detract from the fulfillment of the National Wildlife Refuge System mission or the purpose(s) of the national wildlife refuge;
(13) The Refuge Manager's signature and date signed; and
(14) The Regional Chief's concurrence signature and date signed.
(15) The mandatory 10- or 15-year re-evaluation date.
50 C.F.R. § 26.41(a).